THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SCOTT DAVIS and KEN KUGLER,               :
                                          :
                Plaintiffs,               :
                                          :        3:12-CV-1660
        v.                                :        (JUDGE MARIANI)
                                          :
ALLEN FOX, et al.,                        :
                                          :
                Defendants.               :

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs Scott Davis and Ken Kugler allege First Amendment retaliation (Counts I

and II) and conspiracy (Count III), pursuant to 42 U.S.C. § 1983, against Defendants Allen

Fox, John Wilkes, and Jackson Township. (Doc. 54). Presently before the Court is

Defendants' Motion for Summary Judgment. (Doc. 80). For the reasons set forth below, the

Court will grant Defendants' Motion in part and deny it in part.

### II. FACTUAL BACKGROUND

#### A. Statement of Undisputed Facts

Although the parties contest many of the facts in this case, the following facts are

beyond dispute: Plaintiffs Davis and Kugler are full-time Jackson Township police officers.

(Davis Dep., Doc. 83-11, at 9:23-10:2, 12:1-6; Kugler Dep., Doc. 81-6, at 34:4-8; Collective

Bargaining Agreement ("CBA"), Doc. 81-4, at Art. 4). Within the Jackson Township Police

Department, Davis is Sergeant. (Davis. Dep. at 10:8-10). Kugler is a patrolman. (Kugler

Dep. at 38:17-39:2). Kugler and the other patrolmen answer to Davis, who in turn answers to the Chief of Police. (Davis. Dep. at 33:13-17).

Defendant Jackson Township is a Pennsylvania municipality. Defendants Fox and Wilkes are members of the Jackson Township Board of Supervisors. (Fox. Dep., Doc. 83-8, at 10:12-15; Wilkes Dep., Doc. 83-9, at 11:4-10). The Board of Supervisors oversees the Jackson Township Police Department. (Davis. Dep. at 101:1-16). The Police Department, and its relationship with the Township, is governed by a CBA. (Doc. 81-4).

On December 8, 2011, Davis filed Right to Know ("RTK") requests for information pertaining to the compensation of Township employees and relating to state and federal disaster relief funds obtained by the Township in 2010 and 2011. (Doc. 83-3). Near the end of January, or beginning of February 2012, Plaintiffs reported suspected misconduct by Defendants to the Federal Bureau of Investigation ("FBI"). (See Defs.' Statement of Facts ("DSOF"), Doc. 82, at ¶ 28; Davis Dep. at 60:13-18). On August 21, 2012, Plaintiffs initiated the instant action.

### B. Plaintiffs' Version of the Facts

According to Plaintiffs, the instant action arises amidst a rift between present and past members of the Police Department and Board of Supervisors. The "feud" allegedly originated as a dispute between former Police Chief Jerry Leedock and Supervisor Wilkes over Leedock's reluctance to nominate Wilkes for a Rotary Club award. (Davis Dep. at 383:9-384:13). Davis testified that although Leedock eventually nominated Wilkes, "bad

2

feelings" between the two developed in 2011 after Wilkes did not win the award. (Id.).

According to Davis, the bad blood between Wilkes and Leedock led Wilkes to treat the

Police Department with hostility. Plaintiffs allege that part of this hostility was evidenced in

November 2011, when Wilkes, as Township Treasurer, refused to pay Davis and Kugler for

their participation in a driving under the influence ("DUI") training program as had been done

in the past. (Id. at 40:17-41:1, 382:2-383:10). A paycheck dispute ensued, prompting Davis

to file RTK requests with the Township. (Id. at 32:1-10).

The RTKs, dated December 8, 2011, requested the "[h]ourly wage, total gross

income, and total overtime hours paid to each and every employee and Supervisor of

Jackson Township separately for 2010 and 2011." (Doc. 83-3). They also requested "[a]ll

applications for federal and state disaster assistance and/or grants for 2010 and 2011 filed

by or for Jackson Township. Funded only." (Id.) Davis explained the rationale for his

requests,

> My intention with the payroll [request] was initially to show that other
> employees have received overtime. So they couldn't argue that we weren't
> authorized to have the overtime pay [for the training program]. The
> applications for [information about] FEMA [funding] was because [sic] I
> wanted to see, compared to the amount of hours other employees were paid
> overtime, how much of that was attributed to the disaster, because I wouldn't
> hold that against the Township. . . . And the requests for the DUI checkpoint
> authorizations and the minutes was [sic] to show that we've run similar
> operations in the past, and it didn't require approval at a Township meeting
> every time we run the program.

(Davis Dep. at 41:19-42:15).

3

On January 19, 2012, upon receiving information in response to his RTKs, Davis

began to suspect Defendants were "stealing taxpayer money." (*Id.* at 57:15-21, 60:2-5).

Specifically, Davis was concerned that Wilkes was reporting an exorbitant amount of

overtime hours. (*Id.* at 34:7-15). Davis went to Leedock for advice about his findings and

suspicions. (*Id.* at 35:14-36:25). Leedock recommended that Davis contact the Luzerne

County District Attorney's Office. (*Id.* at 36:1-4).

Pursuant to Leedock's advice, Davis and Kugler met with Detective Dessoye of the

District Attorney's Office. (*Id.* at 38:18-39:22). Detective Dessoye, in turn, recommended

that Davis and Kugler contact the FBI. (*Id.* at 61:3-5). Near the end of January, beginning of

February 2012, Davis, Kugler, and Leedock spoke with the FBI regarding the information

acquired from Davis' RTKs. (*Id.* at 27:2-7, 59:13-19, 60:13-18). As a result of their meeting,

the FBI investigated Davis' suspicions. (*Id.* at 58:13-21). The FBI served a subpoena upon

the Township on February 21, 2012. (*Id.* at 61:22-62:6). According to Davis, an FBI agent

informed him that Defendant Fox knew that it was Plaintiffs who contacted the FBI. (*Id.*).

After Davis filed the RTKs and after they met with the FBI, Plaintiffs allege that the

tensions between Leedock and Wilkes intensified, and Defendants retaliated against them.

Davis testified during his deposition that Plaintiffs previously served the Jackson Township

Police Department—in Davis' case for eighteen years, in Kugler's for twelve—without "a

single reprimand, not a single anything, no interference with the police operations, no

interference with [their] operations, everything [was] fine." (*Id.* at 391:6-11; Kugler at 34:4-

21). However, "everything changed" after Plaintiffs filed the RTKs and went to the FBI. (Davis Dep. at 391:12-392:15). Plaintiffs claim the retaliation began on December 21, 2011 when Fox allegedly threatened Davis' job. (*Id*. at 47:17-23). According to Davis, Fox communicated the threat through Davis' superior officer, Chief Leedock, allegedly stating that Davis was "going to be out of a job" if he did not drop his RTK requests. (*Id*.).

Plaintiffs also claim Defendants "began and continue a campaign of harassment" against them. (Br. in Opp., Doc. 83, at 2). Plaintiffs testified during their depositions that this harassment has caused them to lose pay and overtime. (Davis Dep. at 276:25-277:15, 285:4-286:1; Kugler Dep. at 16:17-17:1). They were allegedly prohibited from doing any DUI patrols and stripped of other job responsibilities. (Kugler Dep. at 16:1-3, 39:10-24). Kugler alleges that he was denied training and pay for his time on military leave, compensation he previously received. (*Id*. at 11:18-12:6, 16:3-5). Davis stated Defendants removed his supervisory authority as well as his white shirt and gold badge, which he stated "is an industry standard for sergeant." (Davis Dep. at 239:12-240:1).

According to Plaintiffs, Defendants engaged in surveillance of them (*id*. at 288:15-289:1) and incited other officers to lodge complaints against them. Plaintiffs assert that Defendants conspired with part-time officers, including Officer John Saranchuk—who took over the Jackson Police Department after Chief Leedock retired, to marginalize Plaintiffs' authority and to create a hostile work environment in order to push them out of the Department. (*See id*. at 293:24-294:11, 353:1-13). As evidence of such a conspiracy,

Plaintiffs point to a series of emails between part-time officers and Defendant Fox. (Doc. 83-2). In these emails, Defendant Fox and the part-time officers strategized about ways to "cut [Davis'] legs out" from under him and planned for "Davis leaving." (Id.). Another email to Defendant Fox stated, "Al[,] it is about to get very hostile between all the new guys and old guys in the department." (Id.). According to the emails, the "old guys in the department" felt that some of the "new guys" were "rats" and "snake[s]" for feeding information to Defendants to undermine Leedock and Plaintiffs. (Id.; see also Doc. 81-5 at 152-53).

## C. Defendants' Version of the Facts

According to Defendants, they never harassed Plaintiffs, nor did they deprive Plaintiffs of any pay or overtime to which they were entitled. (See DSOF at ¶¶ 11-28). Defendants contend that Davis has received overtime and that his pay has actually increased. (Id. at ¶¶ 15, 19). They further argue that there is no evidence Defendants ever directly threatened Davis' job. (Id. at ¶ 21). Defendants note that, despite the alleged threat, Davis never dropped the RTKs. (Id. at ¶ 22). Regarding Kugler, Defendants argue he admitted that he was not subjected to any sort of retaliatory conduct. (Id. at ¶ 28).

Further, Defendants contend that to the extent they scrutinized Plaintiff Davis' conduct, such oversight was the result of Davis' misconduct. (See id. at ¶¶ 29-38). According to Defendants, several officers who worked with Davis had difficult relationships with him and complained to Defendants about his conduct. (Id.). For instance, several officers stated that Davis forced them to pick sides in the dispute between Plaintiffs, and

Chief Leedock, and Defendants. (*See id.* at ¶¶ 33-37). These officers alleged that Davis told them that if they were to "cross" him or cooperate with Defendants, they would not receive backup from other police departments who perceived of them as being "spies" for the Supervisors. (*See id.* at ¶¶ 33-34). The officers stated that Davis instructed them never to have any communication with Township Supervisors. (*Id.* at ¶ 36). Defendants also allege that Davis committed insubordination by refusing to schedule himself for day shifts in violation of the CBA as well as a direct order from the Supervisors. (*Id.* at ¶¶ 46-53). Finally, Defendants contend that Davis defrauded the Township in the amount of $5,881.60 by illegitimately accruing paid sick leave. (Reply Br., Doc. 91, at 2; Fox Aff., Doc. 91-3, at ¶ 13).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to

the non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*

974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed.

2d 659 (1993).

## IV. ANALYSIS

### A. First Amendment Retaliation

"Public employees have a First Amendment right to speak freely on matters of public

concern." *Curinga v. City of Clairton,* 357 F.3d 305, 309 (3d Cir. 2004). As the Third Circuit

noted in *Watters v. City of Philadelphia,* "Judicial vigilance is required to ensure that public

employers do not use their authority to silence discourse on matters of public concern

simply because they disagree with the content of the employee's speech." 55 F.3d 886, 891

(3d Cir. 1995).

> A public employee's retaliation claim for engaging in protected activity must
> be evaluated under a three-step process. *Green v. Phila. Hous. Auth.,* 105
> F.3d 882, 885 (3d Cir. 1997); *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.
> 1996). First, plaintiff must establish the activity in question was protected.

8

*Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir. 1993). For this purpose, the speech must involve a matter of public concern. *Connick* [*v. Meyers*], 461 U.S. [138,] 147, 103 S. Ct. [1684, 75 L. Ed. 2d 708 (1983)]; *Watters*, 55 F.3d at 892. Once this threshold is met, plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968) (requiring courts to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"); *Azzaro* [*v. Cnty. of Allegheny*], [110 F.3d 968, 976 (3d Cir. 1997)]; *Green*, 105 F.3d at 885. These determinations are questions of law for the court. *Waters*, 511 U.S. at 668, 114 S. Ct. 1878; *Green*, 105 F.3d at 885.

If these criteria are established, plaintiff must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); *Watters*, 55 F.3d at 892; *Swineford v. Snyder County Pa.*, 15 F.3d 1258, 1270 (3d Cir. 1994). Lastly, the public employer can rebut the claim by demonstrating "it would have reached the same decision . . . even in the absence of the protected conduct." *Doyle*, 429 U.S. at 287, 97 S. Ct. 568; *Swineford*, 15 F.3d at 1270 (citing *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir. 1983)). The second and third stages of this analysis present questions for the fact finder and are not subject to review in this case. *Green*, 105 F.3d at 889 (recognizing second and third steps in *Pickering*/*Mt. Healthy* analysis are questions for fact finder); *see also Watters*, 55 F.3d at 892 n. 3; *Zamboni v. Stamler*, 847 F.2d 73, 79 n. 6, 80 (3d Cir. [1988]) (noting whether protected activity acted as substantial or motivating factor in discharge and whether same action would have been taken regardless are questions for jury), *cert. denied*, 488 U.S. 899, 109 S. Ct. 245, 102 L. Ed. 2d 233 (1988); *Johnson v. Lincoln Univ.*, 776 F.2d 443, 454 (3d Cir. 1985) (holding "second and third questions . . . should be submitted to the jury").

9

*Baldassare v. New Jersey*, 250 F.3d 188, 194-95 (3d Cir. 2001).[1]

As a threshold issue, the Court must first address whether Plaintiffs' speech is subject to First Amendment protection. In particular, the Court is required to evaluate Plaintiffs' claims in light of the Supreme Court's holding in *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). A public employee's speech is protected when: (1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer lacks "an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418. "[R]elevant to the determination of public concern is the content, context, and form of the statements, 'as determined by the whole record.'" *Smith v. Cent. Dauphin Sch. Dist.*, 419 F. Supp. 2d 639, 646 (M.D. Pa. 2005) (quoting *Connick*, 461 U.S. at 147-48).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Since *Baldassare* and *Garcetti*, the Third Circuit has preserved the distinction between public employees who speak pursuant to their official duties and public employees who

---

[1] The Third Circuit's decision in *Baldassare* preceded the Supreme Court's rulings in *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) and *Lane v. Franks*, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014). However, a review of these decisions demonstrates that the *Baldassare* decision and the principles upon which it is based are entirely consonant with the Supreme Court's holdings in *Garcetti* and *Lane* as well as their reasoning.

speak as citizens on matters of public concern.[2] In determining whether a plaintiff's speech

was made in his capacity as a private citizen or public employee, the Supreme Court stated,

"The proper inquiry is a practical one." *Id.* at 424.

> A court engaged in this practical inquiry should examine, among other things:
> (1) whether the employee's speech relates to "'special knowledge' or
> 'experience' acquired through his job," [*Gorum v. Sessoms*, 561 F.3d 179,
> 185 (3d Cir. 2009) (quoting *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir.
> 2007) *abrogated on other grounds by Borough of Duryea. v. Guarnieri*, 131 S.
> Ct. 2488, 180 L. Ed. 2d 408 (2011))]; (2) whether the employee raises
> complaints or concerns about issues relating to his job duties "up the chain of
> command" at his workplace, *Foraker*, 501 F.3d at 241; (3) whether the
> speech fell within the employee's designated responsibilities, *Gorum*, 561
> F.3d at 186; and (4) whether the employee's speech is in furtherance of his
> designated duties, even if the speech at issue is not part of them.

*Tayoun v. City of Pittston*, --- F. Supp. 2d ----, 2014 WL 3943739, at \*4-5 (M.D. Pa. 2014)

(quoting *Kimmett v. Corbett*, 554 Fed. App'x 106, 111 (3d Cir. 2014)).

Recently, the Supreme Court has clarified that under *Garcetti*'s "pursuant to official

duties" test, the "critical question . . . is whether the speech at issue is itself ordinarily within

the scope of an employee's duties, not whether it merely concerns those duties." *Lane v.*

*Franks*, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014); *see also Flora v. Cnty. of Luzerne*,

--- F.3d ---, 2015 WL 178640, at \*5, \*7 (3d Cir. 2015) (applying *Lane* by asking whether the

---

[2] "We have consistently held that complaints up the chain of command about issues related to an
employee's workplace duties—for example, possible safety issues or misconduct by other employees—are
within an employee's official duties." *Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012).
"Admittedly, . . . there is a social good that comes from internal reporting of misconduct up the chain of
command. The Supreme Court has decided, however, that we should not constitutionalize management
disputes between the government and its employees." *Id.* at 40; *see also Garcia v. Newtown Twp.*, 483 F.
App'x 697, 702 (3d Cir. 2012) ("[I]nternal complaints about workplace management and matters that are
articulated solely because of their personal effect on the employee are not protected speech.")

plaintiff's speech was "part of his ordinary responsibilities," that is, "part of the work he was paid to perform on an ordinary basis"); *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 990 (3d Cir. 2014) ("If anything, *Lane* may broaden *Garcetti*'s holding by including 'ordinary' as a modifier to the scope of an employee's job duties."). In *Lane*, the Court emphasized that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.*

Here, Plaintiffs have established three instances which they contend are protected speech: (1) Davis' filing the RTKs, (2) Plaintiffs' report to the FBI, and (3) their filing of the instant action. Despite conceding during depositions that Plaintiffs engaged in protected speech when they reported Defendants' perceived misconduct to the FBI,[3] Defendants now deny that this constitutes protected speech. (Br. in Supp., Doc. 81, at 6). They argue that because Plaintiffs "followed the chain of command in reporting [their] suspicions of a crime to the FBI," the report was not protected speech.[4]

---

[3] During Davis' deposition, Defense counsel stated,

> Let me just interject that reporting --- reporting to the FBI is a protected activity. We've stipulated to that in all of the motions to dismiss, even the ones that the Judge has granted. It is a protected activity. It doesn't matter why he's doing it. But you can go on if you want.

(Davis Dep. at 376:22-377:6).

[4] Defendants conceded in their Brief in Support of their Motion for Summary Judgment that Plaintiffs "told the FBI that Defendants Fox and Wilkes had violated the law" and "highlight[ed]" a number of facts, including the following:

Plaintiffs: (1) acted in their personal capacities as citizens, (2) did not have a duty to investigate or report federal fraud, and (3) went outside their chain of command when they went to the FBI. According to Davis, Plaintiffs reported their suspicions to the FBI as citizens concerned with the welfare of the Jackson Township taxpayers. (Davis Dep. at 375:22-376:13). Davis stated during his deposition that the information Plaintiffs reported was the product of his RTK requests, which Davis allegedly filed as part of an employment dispute with the Township—rather than as part of, or in furtherance of, his ordinary duties as a police officer. (*See id.* at 41:19-42:15). Davis testified that Jackson Township police officers do not have a responsibility to report the misallocation of federal funds. (*See id.* at 374:5-12). He stated, "That's why we went to the FBI. It's their job to investigate [federal fraud], not mine. It's not a [municipal] police matter that someone in my capacity [as a municipal police officer] would handle even if I wanted to." (*Id.* at 339:23-340:2).

Lastly, Davis noted that the FBI is outside of the Jackson Township Police Department's ordinary chain of command. (*Id.* at 33:11-17; Davis Aff., Doc. 83-6, at ¶ 15). As Defendant Fox noted, the chain of command in the Jackson Township Police

---

In January, 2012, after reviewing information obtained via Davis's Right to Know request, Plaintiffs suspected that the Supervisors had committed a crime in the application for, receipt, and disbursement of FEMA relief funds.

Plaintiffs reported their suspicion that a crime had been committed to (first) the Chief of Police, (second) the DA of Luzerne County, and (third) to the FBI.

(Doc. 81 at 2-3).

Defendants do not challenge that Plaintiffs' report to the FBI, which concerned a suspected misallocation of federal funds, was a matter of public concern.

13

Department is as follows: the Board of Supervisors, the Chief of Police, the Sergeant (Fox. Dep., Doc. 83-8, at 71:17-21) and then the patrolmen (Davis Dep. at 33:13-17). The Third Circuit has drawn an "important distinction" between state employees who report misconduct through the ordinary chain of command and those who go outside of the established channels. *Tayoun*, 2014 WL 3943739, at \*5 (citing *Foraker*, 501 F.3d at 233-34, 243). In *Tayoun*, the plaintiff, the City of Pittston Chief of Police, found illicit photographs on a Pittston Police Department computer. *Id*. at \*1. The plaintiff reported his findings "both to the Mayor, a person in his ordinary chain of command, and to the Pennsylvania Attorney General, an unaffiliated entity not ordinarily within his chain of command." *Id*. at \*6. After a new Mayor took office, the plaintiff alleged that the Mayor demoted him because he had turned in another cop, who was allegedly friends with the new Mayor. *Id*. at \*1. The Court in *Tayoun* held, "Because reporting this nefarious activity to the Attorney General was not an element of Tayoun's official duties, Tayoun acted as a private citizen when reporting these issues independently to that office." *Id*. at \*6 (citing *Davis v. McKinney*, 518 F. 3d 304, 313 (5th Cir. 2008) ("If however a public employee takes his job concerns to persons outside the work place [sic] in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."); *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) ("[A plaintiff's] right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee.")).

14

The Supreme Court's recent decision in *Lane* and the Third Circuit's decisions in *Flora* and *Dougherty* make clear that that Plaintiffs' report to the FBI was protected speech. These cases state that "whether an employee's speech 'concerns the subject matter of his employment' is 'nondispositive' under *Garcetti*, 547 U.S. at 421, 126 S. Ct. 1951." *Dougherty*, 772 F.3d at 989 (brackets omitted); *Flora*, 2015 WL 178640, at *4. "This is because the First Amendment necessarily 'protects some expressions related to the speaker's job.'" *Dougherty*, 772 F.3d at 989 (quoting *Garcetti*, 547 U.S. at 421). "In fact, as the Supreme Court recently reiterated, speech by public employees 'holds special value *precisely because* those employees gain knowledge of matters of public concern through their employment.'" *Id.* (quoting *Lane*, 134 S. Ct. at 2379) (emphasis in *Dougherty*).

In sum, there is no issue of fact that Plaintiffs' speech was not related to their ordinary responsibilities as municipal police officers. Defendants failed to come forward with evidence to show that Plaintiffs' speech was "*ordinarily* within the scope of [their] duties"— duties that Plaintiffs were "paid to perform on an ordinary basis." *See Flora*, 2015 WL 178640, at *5, *7 (quoting *Lane*, 134 S. Ct. at 2378-79) (emphasis in *Flora*). Because the facts of Plaintiffs' activities, specifically their filing of RTK requests and reporting their suspicions of criminal activities to the FBI, are undisputed, the Court finds, as a matter of law, that they engaged in speech protected under the First Amendment.

Second, Defendants contend that they did not take any adverse actions against Plaintiffs. (Br. in Supp. at 9). "[T]he key question in determining whether a cognizable First

Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). "The effect of the alleged conduct on the employee's freedom of speech need not be great in order to be actionable, but it must be more than *de minimis*." *Id.* (internal quotation marks omitted). "[I]ncidents of what might otherwise be trivial harassment may be actionable through their cumulative impact even though the actions would be *de minimis* if considered in isolation[.]" *Id.* (internal quotation marks, alterations omitted) (quoting *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003)).

Contrary to Defendants' contentions, the record demonstrates that there are genuine issues of material fact as to whether Plaintiffs suffered "retaliatory conduct . . . sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *See McKee*, 436 F.3d at 170. During his deposition, Davis testified that after he filed the RTKs, Fox threatened that Davis was "going to be out of a job" if he did not drop them. (Davis Dep. at 47:17-23). Plaintiffs also claim Defendants "began and continue a campaign of harassment" against them. (Br. in Opp. at 2). Such harassment allegedly includes: (1) a loss of pay and overtime (Davis Dep. at 276:25-277:15, 285:4-286:1; Kugler Dep. at 16:17-17:1), (2) a reduction of job responsibilities (Davis Dep. at 239:18-23;Kugler Dep. at 16:1-3, 39:10-24), (3) a denial of job training opportunities (Kugler Dep. at 16:3-5), (4) a loss of Davis' supervisory authority (Davis Dep. at 239:22-240:1), (5) Defendants' surveillance of them (*id.*

16

at 288:15-289:1), (6) the removal of Davis' white shirt and gold badge, which previously

connoted his rank as sergeant (*id.* at 239:12-18), and (7) a conspiracy to incite part-time

officers to lodge frivolous complaints against Plaintiffs in an attempt to push them out of the

Jackson Township Police Department (*see id.* at 293:24-294:11, 353:1-13; Doc. 83-2). Such

actions, if proven at trial, are sufficient to establish a cognizable claim of First Amendment

retaliation.[5] *See McKee*, 436 F.3d at 170.

Defendants proffer a host of arguments disputing Plaintiffs' position that Defendants

took adverse action against them. (Br. in Supp. at 9-10). Defendants contend, *inter alia*,

that: (1) Davis and Kugler have not lost any pay or overtime to which they were entitled, (2)

Defendants did not harass Plaintiffs, and (3) Defendants did not conspire with part-time

officers to retaliate against them. (*Id.*). While Defendants may present these arguments at

trial, and may prevail on them, they present defenses based on disputed issues of fact and,

thus, cannot support the grant of summary judgment. Defendants' assertions either are

predicated upon contested facts or are mere conclusory contentions that Plaintiffs cannot

prove their claims. Moreover, Defendants' arguments do not attempt to negate all of the

instances retaliatory conduct alleged by Plaintiffs.

Therefore, whether Defendants took adverse action against Plaintiffs is an issue for

trial.

---

[5] Defendants contend Plaintiff Kugler admitted that he did not suffer any retaliation. (Reply Br. at 12). This assertion takes liberties with Kugler's deposition testimony. (*See* Doc. 81-6 at 24:2-32:13). While Kugler testified Defendants did not retaliate against him as "directly" as they retaliated against Davis, and that Davis was "taking the brunt" of Defendants' alleged abuse (*id.* at 26:6-24), Kugler also stated that "[o]f course" Defendants emotionally and financially "harmed" him. (*Id.* at 27:25-28:16).

Third, Defendants contend that Plaintiffs cannot demonstrate that retaliation played a substantial role in motivating Defendants' treatment of Plaintiffs. (Br. in Supp. at 11-15). "To establish the causation element of a retaliation claim, a plaintiff must prove that the exercise of his First Amendment rights played some substantial role in motivating the adverse action." *Conklin v. Warrington Twp.*, 2007 WL 4248214, at *3 (M.D. Pa. 2007) (internal quotation marks omitted) *aff'd sub nom. Conklin v. Warrington Twp.*, 304 F. App'x 115 (3d Cir. 2008). To make this showing, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (internal quotation marks and citation omitted); *see also Beyer v. Borough*, 428 F. App'x 149, 155 (3d Cir. 2011) (quoting *Marra* in a First Amendment retaliation case). "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee[.]" *Marra*, 497 F.3d at 302.

Here, the alleged temporal proximity between Plaintiffs' initial protected speech and Defendants' initial adverse action, if proven at trial, may be sufficient for a reasonable jury to find the requisite causal connection. *See Marra*, 497 F.3d at 302. Davis testified that after he filed the RTKs on December 8, 2011, Fox threatened Davis two weeks later, stating that Davis was "going to be out of a job" if he did not drop his RTK requests (Davis Dep. at 391:12-392:15). *See Marra*, 497 F.3d at 302; *Beyer*, 428 F. App'x at 155 (finding unusually suggestive proximity where plaintiff, a borough police officer, posted internet comments critical of the borough council on June 3, 2008 and was fired on July 16, 2008);[6] *Linskey v. Guariglia*, 2012 WL 1268913, at *6 (M.D. Pa. 2012) (finding sufficient allegations of causation in a First Amendment retaliation case, where plaintiff "was requested to vote for the favored [school board] candidate on August 9, 2011, at some point thereafter he voted against hiring the candidate requested by Defendant, and on September 20, 2011, he was removed as Representative to the LIU [Luzerne Intermediate Unit]").

Moreover, viewing the record in the light most favorable to Plaintiffs, Plaintiffs have come forward with sufficient facts to warrant trial on their claims that Defendants engaged in a pattern of antagonism against them after Davis filed the RTK request in December 2011.

---

[6] Defendants assert that the Court should not consider *Beyer* as it is a non-precedential Third Circuit opinion. (Reply Br. at 12). Although not bound by such opinions, *In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006), "district courts may rely on non-precedential opinions as strongly persuasive authority." *United States v. Barney*, 792 F. Supp. 2d 725, 729 (D.N.J. 2011) *aff'd*, 672 F.3d 228 (3d Cir. 2012). Further, Defendants' attempt to distinguish *Beyer* is not persuasive. (*See* Reply Br. at 12). Defendants do not address the key fact that makes *Beyer* applicable here—that the temporal proximity between the adverse action and the protected speech was sufficient to establish a triable inference of causation.

According to Plaintiffs, such antagonism, which allegedly continues to the present, intensified after Plaintiffs reported their suspicions of Defendants' misconduct to the FBI and instituted the instant action. Thus, Plaintiffs also have presented sufficient evidence of causation by providing evidence of "a pattern of antagonism coupled with timing" to warrant trial. *See DeFlaminis*, 480 F.3d at 267; *Flanagan v. Borough of Laflin*, 2014 WL 1315400, at *9 (M.D. Pa. 2014) ("Flanagan alleges facts reflecting a pattern of antagonism from the time he first engaged in purported protected activity in March 2013 when he spoke against the proposed reorganization of the police department until his demotion in October 2013.").

Thus, genuine issues of material fact exist as to whether the adverse actions Defendants allegedly took were causally related to Plaintiffs' protected speech. *See Baldassare*, 250 F.3d at 194-95 (noting that whether protected speech was a substantial or motivating factor is ordinarily a question of fact for a jury) (collecting cases).

Finally, Defendants contend that to the extent they took adverse action against Plaintiff Davis, they would have taken those same actions even in the absence of the protected speech—in light of Davis' misconduct and insubordination. (Br. in Supp. at 13). "A public employer can rebut an employee's claim of retaliation by demonstrating that it would have reached the same decision, even in the absence of the protected conduct." *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (citing *Baldassare*, 250 F.3d at 195). However, "This is a fact intensive inquiry that is often left to a jury." *Tayoun*, 2014 WL

3943739, at *10 (citing *Zamboni*, 847 F.2d at 79 n. 6 ("We note that these inquiries, which follow a determination that speech is protected, are for the jury.")).

Despite Defendants' contentions that their scrutiny of Davis was warranted given his misconduct (*see* DSOF at ¶¶ 29-38), this is not a matter the Court can resolve at this stage in the litigation. Plaintiffs contest most of Defendants' assertions regarding Davis' alleged wrongdoing. Thus, whether Defendants' treatment of Davis was by motivated retaliation, or their legitimate interest in overseeing the Jackson Township Police Department, presents a question of fact for a jury to resolve at trial. *See Tayoun*, 2014 WL 3943739, at *10.

In sum, several issues of material fact exist that preclude the Court from granting Defendants' Motion for Summary Judgment with regard to Plaintiffs' First Amendment retaliation claims.

## B. 42 U.S.C. § 1983 Conspiracy

"Municipal officials may be liable under § 1983 for a conspiracy to deprive an individual of a right protected under the Constitution or federal law." *Eichelman v. Lancaster Cnty.*, 510 F. Supp. 2d 377, 392 (E.D. Pa. 2007). "In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999) *superseded by statute on other grounds as stated in P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009). "[T]o demonstrate the existence of a conspiracy under section 1983, a plaintiff must show that two or more

conspirators reached an agreement to deprive him or her of a constitutional right under

color of law." *Royster v. Beard*, 308 F. App'x 576, 579 (3d Cir. 2009) (internal quotation

marks omitted). "[T]he plaintiff must present evidence of an agreement—'the *sine qua non*

of a conspiracy'—as it is 'not enough that the end result of the parties' independent conduct

caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious

parallelism.'" *Eichelman*, 510 F. Supp. 2d at 392-93 (internal citation omitted) (quoting

*Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)).

Here, Plaintiffs allege Defendants conspired with each other and with certain part-

time officers of the Jackson Township Police Department to retaliate against Plaintiffs for

the RTK requests and their report to the FBI. According to Plaintiffs, Defendants allegedly

incited part-time officers to file frivolous complaints against Plaintiffs in order subject them to

a difficult work environment and to elicit information Defendants could use against them.

(*See* Davis Dep. at 293:24-294:11, 353:1-13; Doc. 83-2). Plaintiffs assert Defendants took

these actions in order to push them out of the Department, as they had allegedly done to

Chief Leedock. (*See id*.). Plaintiffs point to a series of email correspondences between

Defendant Fox and part-time Jackson Township police officers, including Officer

Saranchuk—who took over the Jackson Police Department after Chief Leedock retired.

In an email to Fox, Saranchuk stated that he had spoken with fellow part-time police

officer Jason Kwiatkowski and that they "came up with [the idea to] promote Jay

[Kwiatkowski] to Lieutenant that way he is higher then [sic] Davis which will cut his legs out

even more." (Doc. 83-2). Saranchuk went on to state, "Jay said he would sign an agreement that he would stay at the same rate of pay and upon Davis leaving Jay would relinquish the title and if the spot for Sgt. opened he would put in for it." (*Id.*) In other emails to Fox, Saranchuk indicated that some of the "old guys in the department" felt that some of the "new guys" were "rats" and "snake[s]" for feeding information to Fox to undermine Leedock and Plaintiffs. (*Id.*; *see also* Doc. 81-5 at 152-53). Saranchuk ended one email by stating, "I will continue to give u [Fox] any information we get[.]" (Doc. 83-2). Fox responded to another email by requesting that Saranchuk call him. (*Id.*). Based on these emails, and the record as a whole, a reasonable jury may be able to infer the existence of an agreement between Davis and certain part-time police officers to retaliate against Plaintiffs for their protected speech. Thus, Plaintiffs have produced enough evidence to necessitate trial resolve their conspiracy claim.[7]

However, Plaintiffs fail to proffer evidence that would implicate Defendant Wilkes in the alleged conspiracy. During his deposition, Defense counsel asked Davis whether there was any documentation of Wilkes' involvement in the alleged conspiracy. (Davis Dep. at 323:4-7). Davis responded that there was, "[i]n discovery somewhere." (*Id.* at 323:7-9). As

---

[7] The Court is cognizant of the fact that as part-time patrolmen, Kwiatkowski and Saranchuk, prior to his taking charge of the Department, did not have the authority to take actions against Plaintiffs that could deprive them of their rights. However, to the extent that Defendants may contend that Kwiatkowski and Saranchuk were non-state actors, the Supreme Court has held that § 1983 conspiracy liability may attach to private parties who conspire with a state actor. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42, 102 S. Ct. 2744, 2756, 73 L. Ed. 2d 482 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27-28, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980). Here, Plaintiffs claim Kwiatkowski, Saranchuk, and possibly other part-time officers conspired with Fox who, as Supervisor, was a state actor with supervisory authority over Plaintiffs.

an example, Davis discussed an email in which Wilkes informed Fox of a meeting between Plaintiffs and Leedock. (*Id.* at 323:11-23). From this, Davis extrapolates that Wilkes was part of the alleged conspiracy. (*Id.*).

The summary judgment record does not support Davis' inference. One cannot reasonably infer, based on Davis' deposition testimony, that there was an agreement between Wilkes and the other alleged co-conspirators. The parties do not produce for the Court's review the email Davis refers to during his deposition. Moreover, the emails Plaintiffs do proffer in support of their conspiracy claim do not implicate Wilkes. (Doc. 83-2). None of the emails are from Wilkes, to Wilkes, or reference Wilkes. As such, Plaintiffs' conspiracy claim against Wilkes cannot withstand summary judgment.

In sum, Plaintiffs have produced enough evidence for their conspiracy claim against Davis to survive summary judgment. However, because they have failed to offer evidence implicating Wilkes in the alleged conspiracy, the Court will grant Defendants' Motion for Summary Judgment on Count III in part, with regard to Defendant Wilkes.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment (Doc. 80) with regard to Counts I and II. With regard to Count III, Defendants' Motion will be granted in part with respect to Defendant Wilkes only. Plaintiffs' conspiracy claim against Defendant Fox remains. A separate Order follows.

24

Robert D. Mariani
United States District Judge